## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK
### Syracuse Division

| | |
|---|---|
| CNY Fair Housing, Inc., AmiJo Jordal, Tiphani Carbone, Amaleah Spicer, Emily Hamelin, Sarita Arellano, and Angel Bardin<br>                  Plaintiffs,<br><br>v.<br><br>Douglas Waterbury, E&A Management, Co., and Ontario Realty, Inc.<br><br>              Defendants. | Civil Action No.   5:17-cv-868 (MAD/TWD)<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## NATURE OF ACTION

1.     Plaintiff CNY Fair Housing, Inc. ("CNY Fair Housing"), along with Individual Plaintiffs AmiJo Jordal, Tiphani Carbone, Amaleah Spicer, Emily Hamelin, Sarita Arellano, and Angel Bardin (collectively "Plaintiffs"), bring this action for declaratory, injunctive, and monetary relief against an Oswego-area landlord, Douglas Waterbury, and his corporate realty entities, E&A Management, Co. and Ontario Realty, Inc. (collectively "Defendants"), for discrimination on the basis of sex in violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* and the New York State Human Rights Law, New York Executive Law § 290, *et seq.*

2.     Defendants prey upon women who need low-rent housing by routinely conferring housing benefits because of, or conditioning rental terms on, a woman's willingness to perform sexual favors for Defendant Waterbury.

3.      Defendants' widespread practices of sexual harassment follow a similar pattern: When women contact Defendants seeking available low-rent housing, Defendant Waterbury invites these women to meet with him in person to view the apartment and discuss rental terms. He often encourages, or even instructs, women to come to this meeting alone.

4.      Women who show any interest in renting an apartment at this in-person meeting are often quoted a price for rent that is both much higher than advertised and out-of-line with comparable rentals in the area.  Defendant Waterbury quotes these inflated rental prices to prospective female tenants to gain leverage to negotiate unwelcome sexual trades.

5.      If a woman tells Defendant Waterbury that she cannot afford to pay the amount he requires, or expresses any sense of desperation about finding housing, Defendant Waterbury attempts to capitalize on her vulnerability by using his control over her housing to force her into unwanted sex acts.  He has asked women "how desperate" they are for housing, explicitly told women that they will not be required to pay as much in rent if they perform "sexual favors" for him, and has even gone so far as to physically block the door to prevent a prospective tenant from leaving an apartment viewing until she complied with his demand for oral sex.

6.      Women who are unable to find other housing and feel as if they have no choice but to cede to Defendant Waterbury's unwanted sexual advances are often subjected to ongoing sexual harassment once they move into Defendants' rentals.  In flagrant abuse of his position and authority, Defendant Waterbury has shown up to his female tenants' homes unannounced to demand sex as payment for rent, and he has even let himself into a rental unit without permission by using the key he held as landlord.

7.     On the other hand, women who reject Defendant Waterbury's demands are repeatedly propositioned in an effort to change their minds; punished with higher deposits, fees, and rents; or, in some cases, unable to rent from Defendants at all.

8.     In aggressively pursuing sexual trades from women seeking to rent Defendants' apartments, Defendant Waterbury has created a severe and/or pervasive environment of sexual harassment for women in need of housing, made discriminatory statements on the basis of sex, and retaliated against women who reject his sexual advances.

9.     The Individual Plaintiffs are just some of the many women who have fallen victim to Defendants' ongoing pattern of brazen sexual harassment.  All of the Individual Plaintiffs are young women between the ages of 24 and 32, who encountered Defendant Waterbury during their search for low-rent housing in Oswego.  Defendants discriminated against each of these women by subjecting them to severe and/or repeated sexual harassment in connection with their efforts to secure and live in Defendants' rental housing.

10.     CNY Fair Housing is a private, non-profit fair housing organization that works to ensure fair housing opportunity for residents of Central and Northern New York.  CNY Fair Housing first received a complaint about Defendant Waterbury in or around the fall of 2016 and received additional complaints about his discriminatory and harassing conduct thereafter.  As a result of these complaints, CNY Fair Housing launched an extensive investigation into Defendants' rental practices in Oswego.

11.     Together, Plaintiffs have uncovered Defendants' ongoing practice of egregious sexual harassment against female renters and rental applicants.  Defendants' ongoing sexual harassment of women, which spans from at least 2012 to the present, represents a continuing violation of federal and state fair housing laws.

3

12.     Through their unlawful and discriminatory actions, Defendants have violated Plaintiffs' rights to be free from discrimination on the basis of sex.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 3613.

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a) because that claim arises out of the same transactions as Plaintiffs' federal claim, such that it is part of the same case or controversy.

15.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## PARTIES

16.     Plaintiff CNY Fair Housing is a private, non-profit corporation organized under the laws of New York and registered to do business in New York.  Its principal place of business is located in Syracuse, New York.  CNY Fair Housing's mission is to ensure fair housing opportunity for all people in Central and Northern New York.  Through education, research, advocacy, and enforcement, CNY Fair Housing works to eliminate housing discrimination and promote open communities that are diverse across race, gender, and other protected characteristics. One of CNY Fair Housing's goals is to combat sexual harassment in housing and to enable individuals to select their housing of choice without fear of harassment, unwanted advances, or retaliation.

17.     Plaintiff AmiJo Jordal is a 32-year-old woman residing in Oswego, New York.

18.     Plaintiff Tiphani Carbone is a 25-year-old woman residing in Pulaski, New York.

19.     Plaintiff Amaleah Spicer is a 24-year-old woman residing in Oswego, New York.

4

20.     Plaintiff Emily Hamelin is a 24-year-old woman residing in Oswego, New York.

21.     Plaintiff Angel Bardin is a 32-year-old woman residing in Oswego, New York.

22.     Plaintiff Sarita Arellano is a 27-year-old woman residing in Oswego, New York.

23.     Defendant Douglas Waterbury resides in Oswego, New York.  He owns and manages numerous multi-family residential properties in the Oswego area and is an officer, owner, and/or employee of Defendants E&A Management, Co. and Ontario Realty, Inc.  He acts as landlord for the properties that he owns, either individually or through his corporate entities, and is responsible for all management activities in connection with those properties, including advertising available properties for rent, selecting tenants, setting the terms and conditions for rental housing, collecting rent, and performing maintenance and repair work.

24.     Defendant E&A Management, Co. is a real estate and/or property management company that owns and/or manages properties in the Oswego area.  It is organized and/or conducts business in New York.  E&A Management, Co. is listed as the landlord on leases that Defendant Waterbury enters into with his tenants in Oswego, including Plaintiffs Sarita Arellano's and Angel Bardin's lease.  It acts primarily through Defendant Douglas Waterbury, its owner and principal agent.

25.     Defendant Ontario Realty, Inc. is a real estate and/or property management company that owns and/or manages properties in the Oswego area.  It is organized and/or conducts business in New York.  It has collected payments from tenants of Defendants' properties, including payments from women subjected to Defendant Waterbury's sexual harassment.  It acts primarily through Defendant Douglas Waterbury, its owner and principal agent.

26.     In acting or omitting to act as alleged herein, Defendants E&A Management, Co. and Ontario Realty, Inc. were acting through their employees and/or agents and are liable on the basis of the acts and omissions of their employees and/or agents.

27.     In acting or omitting to act as alleged herein, each employee or officer of Defendants E&A Management, Co. and Ontario Realty, Inc. was acting within the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employer or officer as agent were subsequently ratified and adopted by Defendants as principal.

## FACTUAL BACKGROUND

28.     The City of Oswego is located on Lake Ontario in north central New York.  It has just over 18,000 residents.

29.     Almost 32 percent of Oswego City residents make incomes below the poverty level—about twice the national average. In Oswego County, over 45 percent of female-headed households live in poverty.

30.     Low-rent housing in Oswego and its surrounding areas is limited, and demand for such housing is high.  It is difficult to find and maintain safe, affordable housing in Oswego.

31.     It is against this backdrop that Defendant Waterbury, an Oswego-area landlord, and his realty entities Defendants E&A Management, Co. and Ontario Realty, Inc., operate their rental housing business.

32.     Defendants have made a cottage industry of acquiring residential properties, many of which are barely habitable, and renting them with little to no improvements to low-income Oswego-area residents who are in desperate need of rental housing.

33.     Defendants own approximately 50 properties, many of which are multi-family residential properties that Defendants rent for profit.  Owning a sizeable portion of available rental housing in Oswego, Defendants are major players in the market of low-rent housing in the area.

34.     Defendants advertise their rental properties on Craigslist, in newspapers, and in listings provided to residents who receive public assistance benefits.  In these advertisements, Defendants represent that they have a number of apartments available for rent, with rental prices as low as $495 per month, and with all utilities included.

35.     In some of their advertisements and in communications with prospective tenants, Defendants at times represent that they are willing to accept "trades" as partial payment for rental housing.

36.     For women who contact Defendants to inquire about available rental housing, the "trades" that Defendants are willing to accept as payment for rent do not include manual labor or other goods, but rather sexual favors.

37.     Women seeking to rent from Defendants fall victim to Defendants' ongoing policies and practices of discrimination on the basis of sex.  Pursuant to these unlawful policies and practices, Defendant Waterbury aggressively and repeatedly pursues sexual trades from women seeking to rent Defendants' apartments, creates a severe and/or pervasive environment of sexual harassment for such women, makes discriminatory statements on the basis of sex, and retaliates against women who reject his sexual advances.

38.     Defendants implement their ongoing policies and practices of discrimination against women as follows: Women who contact Defendant Waterbury in response to an advertisement or posting for low-rent housing are invited to meet with Defendant Waterbury in

7

person so that he can show them the apartments that he has available.  In some cases, women are encouraged or instructed to come to the appointment alone.  If they refuse, the apartment is no longer made available to them.

39.     When a woman indicates that she is interested in renting an apartment that Defendant Waterbury has shown to her, Defendant Waterbury often quotes a price for rent that is higher than the prices listed in his advertisements, more than the woman has indicated that she is able to spend, or out-of-line with comparable rental units in the area.  In addition to the high monthly rental price he quotes, Defendant Waterbury purports to require upfront fees above and beyond the usual security deposit and first month's rent that most landlords require, such as last month's rent and/or other deposits he requires to "hold" the apartment.

40.     Defendant Waterbury quotes these inflated rental prices and fees to prospective female tenants in order to gain leverage to negotiate sexual trades.

41.     Defendant Waterbury then preys upon women who tell him that they cannot afford to pay the amount he requires, reveal that they receive public assistance, represent that they are desperate for housing, or otherwise express any sort of vulnerability.  Defendant Waterbury tells these women that there are "other ways" that they can pay the rent or "required" fees in addition to, or in lieu of, money.  When women offer to clean or do other maintenance work for him, he rejects these offers, telling them instead to be "more creative."  And it is quite clear what he means by "creative": he goes on to explicitly ask women to perform "sexual favors" to lessen their financial obligations to him.

42.     Defendant Waterbury is relentless.  He has repeatedly contacted women to follow up on his prior offers to accept sexual trades for rent, even showing up at a woman's home to

8

reiterate his request.  He persists in making unwelcome sexual advances on women, even if they explicitly tell him no.

43.      In fact, Defendant Waterbury often refuses to accept no for an answer.  Through force and intimidation, he has coerced women into engaging in unwanted sexual acts—even going so far as to physically block the door to prevent a prospective tenant from leaving the apartment viewing until she complied with his demand for oral sex.

44.      In sum, Defendant Waterbury routinely confers housing benefits, and sets the price and other conditions of rental housing, on the granting of sexual favors.

45.      As a direct result of Defendant Waterbury's repeated sexual advances, some women have been forced to abandon their efforts to rent from him altogether.  These women are at a disadvantage in their search for housing, as Defendants own a substantial portion of the limited low-rent housing in the area.  Thus, a significant portion of affordable housing is unavailable to these women because they do not wish to subject themselves to Defendant Waterbury's unwanted sexual advances and demands.

46.      Women who reject Defendant Waterbury's advances, but rent an apartment from Defendants nonetheless, do not get the benefits that Defendants condition upon the granting of sexual favors.  Some of these women have been required to pay additional fees and rental costs that they would not have had to pay if they had acquiesced to Defendant Waterbury's sexual demands.

47.      Compounding the oppressiveness of Defendant Waterbury's harassing conduct, female tenants often find it all but impossible to cut off contact with him.  Because Defendant Waterbury is solely responsible for collecting rent, communicating with tenants regarding their rent payments and obligations, and making repairs to their apartments, interacting with

Defendant Waterbury is unavoidable.  Defendant Waterbury's pervasive sexual demands create a hostile environment for these women, who loathe being subjected to his frequent demands, but are required to interact with him nevertheless.  Because these women live in constant fear of Defendants' sexual harassment, they can never be comfortable in, or fully enjoy the sanctity and privacy of, their homes.

48.     While women who are desperate for affordable housing and thus reluctantly acquiesce to Defendant Waterbury's demands pay less in rent than those who reject his advances, they, too, have been repeatedly harassed on the basis of their sex.  Defendant Waterbury has frequently demanded sex in exchange for his continued agreement to set more favorable financial terms and conditions on his rental housing.

49.     In flagrant abuse of his position and authority, Defendant Waterbury has shown up to women's homes unannounced to demand sex as payment for rent and has even let himself into a rental unit, without permission, using the key he held as a landlord.  Further, he has conditioned his performance of property maintenance and repairs on these women's continued willingness to perform sexual favors.  These women are prevented from fully enjoying their homes because of Defendant Waterbury's constant harassment.

50.     Plaintiff CNY Fair Housing is a private, non-profit fair housing organization that works to ensure fair housing opportunity for residents of Central and Northern New York.  CNY Fair Housing first received a complaint about Defendant Waterbury in or around the fall of 2016, and received additional complaints about his discriminatory and harassing conduct thereafter.

51.     In response to these complaints, CNY Fair Housing launched an extensive investigation of Defendants, which included identifying victims of Defendants' harassment, interviewing witnesses who corroborate the Individual Plaintiffs' accounts, monitoring

Defendants' advertisements and online postings from Oswego residents to identify instances of Defendants' harassment and additional victims, collecting relevant data from third parties, and analyzing the results of the information they have collected.

52.   CNY Fair Housing's investigation revealed Defendants' continuing violation of federal and state fair housing laws through an ongoing practice of egregious and repeated sexual harassment against women, and spanning a period of years, from at least 2012 to the present.

53.   Among the many women that CNY Fair Housing has counseled and interviewed are the Individual Plaintiffs, young women who have encountered Defendant Waterbury in their search for low-rent housing in Oswego, New York.  Each of these women fell victim to Defendant Waterbury's severe and/or repeated sexual harassment at a time when they were in need of housing. These Individual Plaintiffs are just some of the women who have fallen victim to Defendants' ongoing pattern of brazen sexual harassment.

**Plaintiff AmiJo Jordal**

54.   Plaintiff AmiJo Jordal is 32 years old.  She lives in Oswego, New York.

55.   In or around November 2012, Ms. Jordal was searching for an apartment to rent in Oswego.  During her search, she saw a Craigslist advertisement for a one-bedroom apartment that she could afford.

56.   Ms. Jordal contacted the number listed in the advertisement and spoke to Defendant Douglas Waterbury, who owned the apartment.  She scheduled an appointment with Defendant Waterbury to view the apartment in person.

57.   At the scheduled appointment, Defendant Waterbury gave Ms. Jordal a tour of the one-bedroom unit and asked her questions about her income.  Ms. Jordal told Defendant

Waterbury that she had recently been approved to receive benefits from the Department of Social Services ("DSS") and that she would be using those benefits to pay her rent.

58.     After learning that Ms. Jordal received DSS benefits, and assuming that she had limited resources, Defendant Waterbury informed her that there were "other ways" that she could pay him rent.  Based on his tone of voice and his demeanor, Ms. Jordal understood that Defendant Waterbury was referring to sexual favors, but she ignored the comment, as she had no interest in his proposal.

59.     Defendant Waterbury then moved toward the door of the apartment. He blocked the entryway and explicitly told her, "You won't have to pay a security deposit if you give me head."

60.     Defendant Waterbury's actions terrified Ms. Jordal.  She did not want to have any type of sexual contact with him.  However, he was larger than her and had purposefully positioned himself in the doorway so that she could not leave the apartment.  Afraid that he would become violent if she tried to escape, and feeling as if she had no choice but to comply with his demands, Ms. Jordal performed oral sex on Defendant Waterbury.  Afterwards, as soon as Defendant Waterbury finally moved from the doorway and allowed Ms. Jordal to leave the apartment, Ms. Jordal fled.  Shaken from her experience with Defendant Waterbury, Ms. Jordal was forced to abandon all efforts to rent any housing from him.

61.     Ms. Jordal continues to experience fear and anxiety as a result of her unwanted encounter with Defendant Waterbury.  Since 2012, she has had to search for rental housing but has found that Defendant Waterbury owns a substantial number of the available, low-rent apartments in the area.  Accordingly, Defendants' discriminatory acts continue to make a sizeable number of apartments unavailable to her, as she remains in fear that she will be

subjected to Defendants' abusive conduct.  Ms. Jordal's fear and distress is compounded by the

fact that she often sees Defendant Waterbury around town, and she is forced to relive her

traumatic experience every time she encounters him.

**Plaintiff Tiphani Carbone**

62.     Plaintiff Tiphani Carbone is 25 years old.  She is homeless and currently resides

with her family in a motel in Pulaski, New York.

63.     Ms. Carbone first met Defendant Waterbury in or around late 2016, when she

encountered him as she was walking in Oswego, New York.  Ms. Carbone was carrying a

number of items in her arms.  Defendant Waterbury, who had been driving, pulled up to her in

his car and offered her a ride home.  She accepted, and Defendant Waterbury drove her to her

apartment.

64.     While in Defendant Waterbury's car, Ms. Carbone and Defendant Waterbury

discussed her current landlord, the fact that her landlord planned to sell the building in which she

lived, and that Defendant Waterbury owned a number of rental properties in the area.  Defendant

Waterbury asked for Ms. Carbone's telephone number so that he could contact her about

available housing.

65.     Additionally, Defendant Waterbury asked Ms. Carbone questions about her

income, and Ms. Carbone informed him that she paid her rent with assistance from DSS.

66.     Consistent with Defendant Waterbury's pattern of preying upon women with

limited resources, when he learned that Ms. Carbone received public assistance, he told her that

he could "work with" her in setting a price for rent.  When Ms. Carbone asked him to explain

what he meant, Defendant Waterbury explicitly asked her if she would be willing to perform

"sexual favors" in order to lower the security deposit and/or rent that she would be required to

pay him.  Defendant Waterbury's sexual advances made Ms. Carbone extremely uncomfortable. She told him no and got out of his car.

67.     For a period of months following their initial interaction, Defendant Waterbury continued to harass Ms. Carbone by repeatedly making unwelcome sexual advances toward her, offering to trade sexual favors for cheaper rent, and demanding to meet with her in person to discuss the terms of his rental housing.  Ms. Carbone repeatedly rejected Defendant Waterbury's advances, making clear to him that she did not want to have any sexual interaction with him.

68.     For example, Defendant Waterbury contacted Ms. Carbone by telephone and approached her in person when he saw her around town to discuss apartments he had available for rent.  Defendant Waterbury then reiterated his offer to lower the price of the rent or the security deposit for his rental housing if she agreed to perform sexual favors.  Each time Defendant Waterbury made a sexual request, Ms. Carbone told him no.

69.     On one occasion, Defendant Waterbury showed up to Ms. Carbone's apartment where she lived with her boyfriend and demanded to speak to her alone about the terms of renting an apartment from him.

70.     Another time, Ms. Carbone unwittingly contacted Defendant Waterbury after calling a number associated with a listing for low-rent apartments in a DSS pamphlet while she was actively looking for a new apartment to rent.  Defendant Waterbury, who apparently recognized her telephone number, continued to press Ms. Carbone about his desire to meet with her alone, without her boyfriend present, to discuss the listed apartment.

71.     Although Ms. Carbone needed housing, and had not yet found another available alternative that she could afford at that time, she told Defendant Waterbury that she was no longer interested in the apartment.  Ms. Carbone declined Defendant Waterbury's invitation to

view the apartment because she did not want to be alone with him and be subjected to his demands.

72.     On a separate instance, Ms. Carbone and her boyfriend were searching through listings for available apartments and saw an advertisement for two-bedroom apartments at a price point they could afford.  The advertisement did not provide the name of the landlord.  Ms. Carbone's boyfriend called the number.  Defendant Waterbury answered.  Despite having posted an advertisement for available two-bedroom apartments, Defendant Waterbury represented to Ms. Carbone's boyfriend that he had no such apartments available.

73.     Believing that Defendant Waterbury's representations were false, Ms. Carbone called the same number minutes later to inquire about the availability of two-bedroom apartments for rent.  Defendant Waterbury again answered the call, but gave Ms. Carbone completely different information, telling her that he did, in fact, have two-bedroom apartments available and again reiterating that he would lower the rent and deposit amounts if she performed "sexual favors" for him.  When Ms. Carbone tried to avoid Defendant Waterbury's harassment by telling Defendant Waterbury that her boyfriend would be viewing the apartments and handling any logistics associated with renting an apartment, Defendant Waterbury told her that she needed to meet with him alone if she wanted to see his properties.

74.     In sum, Defendant Waterbury repeatedly conditioned the price for his rental housing—and the availability of such housing—on Ms. Carbone's agreement to perform sexual favors for him.  Defendant Waterbury did not provide Ms. Carbone the option to discuss renting an apartment from him without also discussing her willingness to have sex with him in order to satisfy her rental obligations.

75.     Although Ms. Carbone needed an apartment at the time that she had these interactions with Defendant Waterbury, she did not want to have any sexual contact with him and did not want to subject herself to his ongoing harassment.  Accordingly, as a direct result of his harassing conduct, she abandoned all efforts to secure rental housing from him and has avoided making inquiries regarding any building or rental unit that he owns.

76.     Defendant Waterbury's constant harassment caused Ms. Carbone to suffer fear, anxiety, and emotional distress.  Further, Defendants' unlawful actions have impacted her ability to secure housing for herself and her family.  Defendant Waterbury owns many of the apartments in Oswego that would have been in Ms. Carbone's budget. However, because of his repeated and aggressive sexual harassment, Ms. Carbone is unable to pursue rentals in any of those apartments. Despite holding a DSS voucher, which would cover the rent that she would be required to pay for private housing, Ms. Carbone and her family remain homeless.

**Plaintiffs Amaleah Spicer and Emily Hamelin**

77.     Plaintiffs Amaleah Spicer and Emily Hamelin are roommates and share a residence in Oswego, New York.  They are both 24 years old.

78.     In the summer of 2014, Ms. Spicer was almost seven months pregnant with her second child.  She was sleeping on a couch in her father's one-bedroom apartment and needed to find a place of her own to live with her children.

79.     While searching for housing, Ms. Spicer came across a Craigslist advertisement for rental housing that stated that the landlord was willing to do "trades."  Based upon the advertisement, Ms. Spicer assumed that the landlord allowed tenants to perform cleaning and other manual labor for a reduced rental rate.  She contacted the number in the advertisement and

spoke with Defendant Waterbury, who had posted the listing.  She made an appointment to meet with him to view his apartments.

80.     Ms. Spicer brought her young daughter to the appointment with her.  Ms. Spicer told Defendant Waterbury the price range that she could afford for rent and that she would be paying her rent with assistance from DSS.

81.     Defendant Waterbury showed Ms. Spicer at least two apartments that he had available for rent.  She expressed interest in renting one of the units he showed her.

82.     Ms. Spicer inquired about the rental price of the apartment.  Defendant Waterbury quoted her a price that was much higher than the price range that she told him she could afford.

83.     When Ms. Spicer told Defendant Waterbury that she could not afford to rent the apartment at the price quoted, Defendant Waterbury informed her that her financial obligations to him would be less if she did "trades."  Ms. Spicer asked Defendant Waterbury if he was referring to household work like cleaning or painting, but Defendant Waterbury responded, "No, you know, trades." As he made the statement, Defendant Waterbury grabbed his crotch.  Ms. Spicer was offended that Defendant Waterbury had made an explicitly sexual gesture in front of her daughter, and she immediately left the apartment.

84.     After a difficult and time-consuming search, Ms. Spicer ultimately found another apartment to rent.

85.     By May of 2015, Ms. Spicer needed to find another place to live with her children.  Ms. Spicer and her friend, Plaintiff Emily Hamelin, decided that they would look for a place to live together as roommates, along with their children, in order to cut down on their respective monthly expenses.

86.     Both Ms. Spicer and Ms. Hamelin had limited incomes and resources.  They looked for, but could not find, a suitable, available home for rent that they could afford. As their move-out dates became imminent, Ms. Spicer reluctantly contacted Defendant Waterbury, who she knew owned a number of low-rent properties in the area, to see if he had any housing that she and Ms. Hamelin could rent.

87.     Consistent with his ongoing policies and practices of sexual harassment, Defendant Waterbury conditioned both the availability and price of his rental housing on Ms. Spicer's and Ms. Hamelin's agreement to have sex with him.  Through Defendant Waterbury's statements and actions, both women understood that he would penalize them, either by attempting to charge them higher prices for rent or refusing to rent to them at all, unless they were willing to perform sexual favors for him.  Desperate for housing, and believing that they had no other options, Ms. Spicer and Ms. Hamelin reluctantly acquiesced to his demands in order to lease an apartment from him.

88.     For a period of many months following their inquiry—both leading up to the time that they moved into the home that they ultimately leased from Defendant Waterbury and afterwards—Defendant Waterbury subjected Ms. Spicer and Ms. Hamelin to ongoing, severe, and pervasive sexual harassment, which included, among other things, frequent demands for sex in exchange for continued housing benefits.

89.     When Defendant Waterbury was showing Ms. Spicer and Ms. Hamelin apartments and homes that he had available for rent, he told them explicitly that the price that they would have to pay for rent depended on their agreement to perform sexual favors as "trades."  In other words, they would have to pay more money for his rental housing if they did not have sex with him, and less money if they did.

90.     Before Ms. Spicer and Ms. Hamelin moved into their new rental home, Defendant Waterbury contacted them to demand sex.  Both Ms. Spicer and Ms. Hamelin told him that they did not want him to come over, but Defendant Waterbury showed up anyway.  Through intimidation, Defendant Waterbury coerced both women into having sex with him, even though Ms. Spicer and Ms. Hamelin repeatedly told him that they did not want to, as payment for continuing to provide them with housing.

91.     Defendant Waterbury's actions after Ms. Spicer and Ms. Hamelin moved into the rental property in July 2015 were equally brazen.  Defendant Waterbury repeatedly called Ms. Spicer and Ms. Hamelin demanding sex.  He would insist that Ms. Spicer accompany him to one of his other apartments to have sex with him while Ms. Hamelin stayed home to watch the children, and vice versa.  On at least one occasion, he insisted that the women find a babysitter so that they could both accompany him to another location to have sex.

92.     Defendant Waterbury would get visibly angry if Ms. Spicer and Ms. Hamelin resisted his sexual advances.  When Ms. Spicer and Ms. Hamelin attempted to ignore Defendant Waterbury's telephone calls, he would show up to the house unannounced.  He even let himself into the rental home against their wishes by using the key that he held as their landlord.

93.     Based on Defendant Waterbury's statements and conduct, both women understood that if they did not continue to have sex with him, they and their young children would be evicted.

94.     Not only did Defendant Waterbury condition their ability to live in the unit on Ms. Spicer's and Ms. Hamelin's acquiescence to his sexual demands, but Defendant Waterbury also conditioned his performance of necessary maintenance tasks on sexual favors.  The home that they were renting from Defendant Waterbury had a number of significant maintenance

problems.  For example, the garage was filled with garbage, the home was infested with mice

and other rodents, and the furnace was not working.  In response to their requests for

maintenance service, Defendant Waterbury would complain that the women were not as "fun" as

he wanted them to be, that they were not having sex with him as frequently as he wanted, and

that they should not use protection during the sex he demanded from them.

95.     By August 2015, Ms. Spicer and Ms. Hamelin decided to live separately.  Ms.

Spicer began looking for another home to rent.  Again, with her limited income, she had

difficulty finding places that she could afford.  Defendant Waterbury had affordable properties

that were available for rent, but he continued to insist that she perform sexual favors for him in

order to rent any of his properties.

96.     Up until the very end of August 2015, Defendant Waterbury continued to make

unwelcome sexual advances on Ms. Spicer, demand sex from her, and condition the price and

availability of his rental housing on her agreement to engage in sex acts with him.

97.     At the end of August, Ms. Spicer received a call from another landlord about an

available apartment that she could rent.  She immediately signed a lease with the new landlord so

that she would not have to continue to fulfill Defendant Waterbury's sexual requests and

demands.

98.     Ms. Hamelin continued to live in Defendant Waterbury's rental property after Ms.

Spicer left, while she looked for another home that she could rent free from Defendant

Waterbury's constant, unwelcomed sexual advances and harassment.  By October 2015, it was

too cold to live in a home with no working furnace, and she wanted to escape Defendant

Waterbury's continuing sexual demands, so she left.

99.     In total, Defendant Waterbury required Ms. Spicer and Ms. Hamelin to engage in sexual acts with Defendant Waterbury in excess of fifteen times each, all as part of Defendant Waterbury's ongoing pattern of sexual harassment against women who rent housing from him. In doing so, Defendant Waterbury repeatedly placed Ms. Spicer and Ms. Hamelin in a position where they were forced to choose between their housing, a basic necessity, and their desire to avoid his sexual advances.  Each unwanted encounter with Defendant Waterbury caused Ms. Spicer and Ms. Hamelin to experience anxiety, fear, emotional distress, and significant embarrassment.  The cumulative impact of his harassing conduct has caused their injuries to persist to present.

**Plaintiffs Sarita Arellano and Angel Bardin**

100.    Sarita Arellano and Angel Bardin are partners.  Ms. Arellano is 27 years old and Ms. Bardin is 32 years old.  They reside in Oswego, New York.  Defendant Waterbury is their landlord.

101.    Defendant Waterbury has subjected—and continues to subject—Ms. Arellano and Ms. Bardin to continuous, severe, and pervasive sexual harassment by, among other things, making repeated and unwelcome sexual requests in connection with their rent payments.

102.    In or around May of 2017, Ms. Arellano and Ms. Bardin were looking for an apartment to rent.  Ms. Arellano saw an advertisement for one- to four-bedroom apartments available for rent starting at $495 per month.

103.    Ms. Arellano contacted the telephone number listed in connection with the apartments and reached Defendant Waterbury, who had placed the advertisement.  She set up an appointment with Defendant Waterbury for her and Ms. Bardin to view Defendant Waterbury's apartments in person.

104.     Ms. Arellano and Ms. Bardin met with Defendant Waterbury to view the apartments that he had available for rent.  Ms. Arellano and Ms. Bardin expressed interest in renting one of the apartments that they toured.

105.     Defendant Waterbury told Ms. Arellano and Ms. Bardin that the apartment would go fast, and that they had to pay a deposit to hold it.

106.     Ms. Bardin indicated that she could only afford to pay a $100 deposit to hold the apartment.  Defendant Waterbury agreed to accept that amount.

107.     Defendant Waterbury, Ms. Arellano, and Ms. Bardin discussed the rental terms for the apartment.  Defendant Waterbury informed the two women that the rent for the one-bedroom apartment would be $1,198 per month. Defendant Waterbury presented the women with a two-year lease, insisting that they should sign a two-year agreement to lock in the price.

108.     The almost $1,200 per month that Defendant Waterbury required Ms. Arellano and Ms. Bardin to pay for the one-bedroom apartment was higher than rents for similar one-bedroom apartments in the area.  Defendant Waterbury used the inflated rent as leverage to negotiate a more reasonable rental price in exchange for sexual favors.

109.     In addition to the monthly rent for the apartment, Defendant Waterbury also informed Ms. Arellano and Ms. Bardin that they would have to pay a security deposit of $1,198, first month's rent (of the same price), and last month's rent before moving into the apartment. They would also be required to pay a pet deposit for their dog.

110.     Ms. Bardin told Defendant Waterbury that she and Ms. Arellano would need time to pay that amount of money.  In response, Defendant Waterbury indicated that he would be willing to "work with" them, telling them that he would waive the security and pet deposits.

111.    Ms. Arellano's and Ms. Bardin's deadline for moving out of their existing unit was rapidly approaching, but they still needed to come up with the first and last month's rent before moving into Defendant Waterbury's apartment.  Ms. Bardin contacted Defendant Waterbury to determine if they could move into the apartment earlier, without paying the full amount that he was requesting upfront.

112.    Defendant Waterbury wanted to meet with Ms. Arellano and Ms. Bardin in-person to discuss their request.  Ms. Arellano and Ms. Bardin agreed to the in-person meeting.

113.    During the meeting, Defendant Waterbury asked Ms. Bardin and Ms. Arellano to tell him how "badly" they wanted the apartment, how "dedicated" they were to getting the apartment, and what they would be willing to do to move into the apartment earlier.

114.    Ms. Bardin explained that she had noticed maintenance issues with the apartment and could fix those issues, but Defendant Waterbury told her that he already had someone to do maintenance for him, and was looking for them to do something more "personal" for him. Defendant Waterbury specifically asked Ms. Arellano and Ms. Bardin if they would be willing to do "personal favors" to move into the apartment earlier. Based upon his tone, demeanor, and the fact that he had rejected the offer to perform maintenance-type services at the apartment, Ms. Arellano and Ms. Bardin understood Defendant Waterbury's reference to "personal favors" to mean sexual favors.

115.    Defendant Waterbury's request for "personal favors" made Ms. Arellano and Ms. Bardin extraordinarily uncomfortable.  They had no desire whatsoever to have any sort of sexual contact with Defendant Waterbury, and ignored his inappropriate request.

116.    In addition to his request for sexual favors, Defendant Waterbury asked Ms. Arellano and Ms. Bardin intrusive, personal questions about their sexual orientations and

relationship history while discussing the terms of rental with them.  Defendant Waterbury probed whether they had ever been with men and other personal matters about their sexual histories.

117.    Both women continued to ignore Defendant Waterbury's sexual advances and his questions about their sexual histories.

118.    Ultimately, because they did not take him up on his offer to perform "personal favors," Defendant Waterbury demanded that Ms. Arellano and Ms. Bardin sign a document giving him the power to evict them immediately, without the regular notices required by law, in order to move into the apartment.

119.    Ms. Arellano and Ms. Bardin moved into Defendant Waterbury's one-bedroom rental unit shortly thereafter.

120.    Even after they moved in, Defendant Waterbury continued to aggressively pursue sexual trades for rent.  In doing so, he has created a severe and/or pervasive hostile environment in which both women have been forced to endure his repeated requests for sexual and personal favors in their communications with him about the terms and conditions of their rental housing.

121.    For example, on one occasion, Defendant Waterbury came to the apartment and asked both women to step outside to talk to him.  He expressly asked the women whether they would perform sexual favors, telling them that if they agreed, they would not be required to pay him as much money.  Both women said no, and accordingly, they were required to continue to pay a higher rental rate.

122.    On other occasions, when Defendant Waterbury has seen Ms. Arellano and Ms. Bardin in person at the apartment building, he has continued to probe their willingness to perform personal or sexual favors for him.

123.    Defendant Waterbury has retaliated against Ms. Arellano and Ms. Bardin for their refusal to comply with his sexual requests.  Although he had initially agreed to waive the security deposit, he reversed course after they moved in, insisting that they owed him an additional $1,198 in rent and fees.  On at least one occasion, Defendant Waterbury has charged Ms. Bardin's credit card, without her express authorization, for additional money that he claims he was owed, which she would not have been required to pay if she had not rejected his advances.

124.    Had Ms. Arellano and Ms. Bardin agreed to perform sexual favors for Defendant Waterbury, he would not have required them to pay a security deposit, first month's rent, and last month's rent upfront.  Indeed, he has not required male tenants, or female tenants who cede to his sexual demands, to pay last month's rent in addition to other rent payments and deposits.

125.    As a direct result of Defendant Waterbury's repeated and continuous sexual requests, Ms. Arellano and Ms. Bardin are unable to freely enjoy their apartment.  Although they do not want to interact with Defendant Waterbury because of his repeated sexual harassment, they cannot avoid communicating with him because he is their landlord.  Because these women live in constant fear of Defendants' sexual harassment, they can never be comfortable in, or fully enjoy the sanctity and privacy of, their homes.

**INJURY TO PLAINTIFFS**

126.    Defendants' actions in repeatedly propositioning the Individual Plaintiffs for sexual trades in exchange for rent and other housing benefits, as described above, have caused the Individual Plaintiffs injuries, both emotional and financial.

127.    As a direct, proximate, and foreseeable result of Defendants' persistent and flagrant harassment, the Individual Plaintiffs have suffered and continue to suffer emotional

distress, humiliation, loss of housing opportunities, and the deprivation of their housing and civil rights.

128.    In addition to the emotional distress that they suffered, the Individual Plaintiffs have suffered economic loss as a direct, proximate, and foreseeable result of Defendants' discriminatory conduct.  These losses include but are not limited to: payment of higher rents, fees, or deposits when sexual advances were rejected, being forced to look elsewhere for housing to avoid renting any of the many properties affiliated with Defendants, and other harms.

129.    As a direct, proximate, and foreseeable result of Defendants' discriminatory actions, as described above, CNY Fair Housing has been required to expend significant staff time and incur expenses to identify the scope of Defendants' unlawful conduct and the breadth of its impact, and, furthermore, to take steps to counteract the detrimental effects of Defendants' conduct.

130.    For example, CNY Fair Housing has expended significant time and resources identifying and counseling victims of Defendants' harassment, interviewing witnesses, monitoring Defendants' advertisements and online postings from Oswego residents concerning Defendants to identify instances of Defendants' continuing harassment and additional victims, collecting relevant data from third parties, and analyzing the results of their data collection.

131.    CNY Fair Housing has been forced to make out-of-pocket expenditures to conduct its investigation of Defendants' discriminatory acts and identify appropriate counteractive measures, including travel expenses and costs related to its data collection.

132.    In addition, CNY Fair Housing has had to expend, and will continue to have to expend, resources to counteract the effects of Defendants' discrimination by, among other things, conducting outreach to the community about Defendants' discriminatory harassment and

educating community members about sexual harassment and discrimination on the basis of sex. These activities have required, and will continue to require, the expenditure of considerable financial resources and staff time.

133.    For example, in connection with one of its outreach efforts, CNY Fair Housing staff created educational flyers and distributed them at multiple locations throughout the Oswego region. The flyers detailed the FHA's protections against sexual harassment and explained CNY Fair Housing's efforts in helping to enforce fair housing law.

134.    Additionally, CNY Fair Housing produced advertisements and purchased advertising space at Oswego bus shelters detailing information on sexual harassment.  In direct response to Defendants' discrimination, CNY Fair Housing staff have also conducted trainings and presentations on sexual harassment with agencies serving the Oswego-area and counseled multiple victims on their fair housing rights against sex-based discrimination, including but not limited to the Individual Plaintiffs.

135.    Because it has had to devote so much of its time and resources to address Defendants' discriminatory conduct, CNY Fair Housing has had to put on hold, or shelve entirely, other projects that would have helped to further its mission. In other words, Defendants' discriminatory acts forced CNY Fair Housing to divert its scant resources from other activities it sought to conduct.

136.    Some of the projects on which CNY Fair Housing would have expended its resources and staff time were it not for Defendants' acts include:

a.    Multiple training sessions for landlords and real estate professionals with regard to fair housing compliance, which would have served over two hundred individuals and would have been paid for by the housing providers;

27

b.    Audit-based testing designed to address complaints of systemic discrimination, including investigation into local real estate sales practices and rental discrimination against families with children;

c.    An investigation into discriminatory practices by a City of Utica property management company;

d.    Completion of the Executive Director's licensed real-estate instructor certification, a necessary qualification to teach fair housing courses in the region;

e.    Participation in, and planning of, scheduled outreach events and workshops, including CNY Fair Housing's fall conference, thereby limiting the organization's ability to achieve desired levels of community outreach and sponsorship;

f.    Participation in a community task force in the City of Syracuse to improve housing quality; and

g.    Filing of enforcement complaints with state and federal regulatory agencies.

137.    In addition to the damages it has suffered as a result of being required to divert its limited resources, Defendants' discriminatory acts have frustrated, and continue to frustrate, CNY Fair Housing's mission of ensuring that all people have equal access to housing opportunities in its service region and of eliminating housing discrimination against protected classes, including women. Defendants' flagrant and recurring violations of the Fair Housing Act directly impede CNY Fair Housing's efforts, both in educating the public on their fair housing rights and in preventing discriminatory decision-making by housing providers, and has, accordingly, damaged CNY Fair Housing's reputation.

138.   Further, with its six-person staff, CNY Fair Housing has very limited resources, and discriminatory practices that require it to divert those resources from other worthy projects frustrate the full achievement of CNY Fair Housing's broad mission.

139.   The injury to CNY Fair Housing's mission is a direct, proximate, and foreseeable result of Defendants' discrimination.

140.   CNY Fair Housing's investigation and counteraction of Defendants' conduct, its diversion of resources, and the frustration of its mission continue through the present, and will continue until Defendants' discriminatory conduct ceases and the harms caused by Defendants' actions are remedied.  Defendants' discriminatory acts have injured, and are continuing to injure, CNY Fair Housing.

141.   Defendants' unlawful actions as described herein were, and remain, intentional, willful and knowing, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' legal rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(All Plaintiffs Against All Defendants)**

### Violation of Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

142.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 141 as if fully set forth herein.

143.   Defendants' conduct, as described above, constitutes quid pro quo harassment. Defendants have made unwelcome requests or demands to engage in sexual conduct where submission to the request or demand, either explicitly or implicitly, is made a condition related to: the rental or availability of a dwelling; the terms, conditions, or privileges of the rental; and/or the provision of services or facilities in connection to the rental.

29

144.    Defendants' conduct, as described above, constitutes hostile environment harassment.  Defendants have engaged in unwelcome conduct that is sufficiently severe or pervasive as to interfere with: the availability, rental, or use or enjoyment of a dwelling; the terms, conditions or privileges of the rental; and/or the provision or enjoyment of services or facilities in connection to the rental.

145.    Defendants' conduct, as described above, violates multiple provisions of the Fair Housing Act. Specifically, Defendants' sexual harassment constitutes:

> a.    A denial of housing or making housing unavailable because of sex, in violation of Section 804(a) of the FHA, 42 U.S.C. § 3604(a);
>
> b.    Discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith, because of sex, in violation of Section 804(b) of the FHA, 42 U.S.C. § 3604(b);
>
> c.    The making of statements with respect to the rental of dwellings that indicate a preference, limitation, or discrimination based on sex, in violation of Section 804(c) of the FHA, 42 U.S.C. § 3604(c); and
>
> d.    Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 804 of the Fair Housing Act, in violation of Section 818 of the FHA, 42 U.S.C. § 3617.

146.    Plaintiffs have been injured by the discriminatory conduct of Defendants. Such persons are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and have suffered damages as a result of Defendants' conduct.

147.    The conduct of Defendants was intentional, willful, and/or taken in reckless disregard for Plaintiffs' rights and the rights of others.

## SECOND CAUSE OF ACTION
### (All Plaintiffs Against All Defendants)

### Violation of New York Executive Law § 296

148.    Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 141 as if fully set forth herein.

149.    Defendants' conduct, as described above, violates multiple provisions of N.Y. Executive Law § 296. Specifically, Defendants' sexual harassment constitutes:

a.   A denial or withholding of housing because of sex, in violation of N.Y. Executive Law § 296-5(a)(1) and (c)(1);

b.   Discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith, because of sex, in violation of N.Y. Executive Law § 296-5(a)(2) and (c)(2);

c.   The making of statements with respect to the rental of dwellings that indicate a limitation, specification, or discrimination based on sex, in violation of N.Y. Executive Law § 296-5(a)(3) and (c)(3);

d.   Retaliation or discrimination against persons because they have opposed practices forbidden under the statute, in violation of N.Y. Executive Law §§ 296-7.

150.    The conduct of Defendants was intentional, willful, and/or taken in reckless disregard for Plaintiffs' rights and the rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants as follows:

a.      Declaring that Defendants' actions violate the Federal Fair Housing Act, 42 U.S.C. § 3601, *et seq*. and the New York State Human Rights Law, New York Executive Law § 296, *et seq.*

b.      Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

c.      Awarding compensatory damages to each Plaintiff in an amount to be determined by a jury that would fully compensate each Plaintiff for the injuries caused by the conduct of Defendants alleged herein;

d.      Awarding punitive damages to each Plaintiff in an amount to be determined by a jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e.      Awarding reasonable attorneys' fees and costs; and

f.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FED. R. CIV. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.


Dated: August 8, 2017

Respectfully submitted,

/s/ Conor Kirchner
Conor Kirchner
CNY Fair Housing, Inc.
731 James Street
Syracuse, NY 13203
(315) 471-0420
cjkirchn@cnyfairhousing.org

Megan Cacace*
Jia M. Cobb*
Yiyang Wu*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (facsimile)
mcacace@relmanlaw.com
jcobb@relmanlaw.com
ywu@relmanlaw.com


* *Pro hac vice* admission to be sought